UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Evan Lawrence**

    **v.**                                  Civil No. 10-cv-00183-PB
                                             Opinion No. 2011 DNH 098
**Michael J. Astrue, Commissioner**,
**Social Security Administration**


MEMORANDUM AND ORDER


    Evan Lawrence appeals the Social Security Commissioner's
denial of his application for child insurance benefits and
supplemental security income benefits.  Lawrence contends that
the administrative law judge incorrectly found that Lawrence was
not disabled.  For the reasons set forth below, I affirm the
Commissioner's decision.


## I.    BACKGROUND[1]

### A.    Administrative Proceedings

    On January 7, 2008, Lawrence filed an application for child
insurance benefits and supplemental security income benefits
alleging an onset date of October 15, 2007.  (Tr. 71-78).  These

---

[1] The background facts are presented in detail in the parties'
Joint Statement of Material Facts (Doc. No. 12) and are
summarized here.  Citations to the Administrative Record
Transcript are indicated by "Tr."

claims were denied initially on April 28, 2008.  (Tr. 81-82).
Thereafter, Lawrence filed a written request for hearing on June
27, 2008.  (Tr. 57).  Lawrence, represented by counsel, appeared
and testified at a hearing before an administrative law judge
("ALJ") on November 13, 2009.  (Tr. 20-45).  At the hearing,
Lawrence amended his alleged onset date to July 7, 2006.  (Tr.
187).

The ALJ denied Lawrence's applications in a decision dated
November 24, 2009.  (Tr. 4-19).  While the ALJ found that
Lawrence's attention deficit disorder ("ADD") was a severe
impairment, he determined that it did not meet or equal the
criteria identified in 20 C.F.R. Part 404, Subpart P, Appendix
1, Sections 12.02, 12.04 or 12.06.  (Tr. 10-12).  In addition,
the ALJ determined that Lawrence had the residual functional
capacity ("RFC") to perform work that existed in significant
numbers in the national economy.  (Tr. 12-15).

The ALJ's decision became final when the Commissioner's
Decision Review Board failed to take any timely action.  This
matter is now ripe for review under 42 U.S.C. § 405(g).

**B.   <u>Medical Evidence</u>**

Lawrence was diagnosed with attention deficit hyperactivity
disorder ("ADHD") when he was six years old.  (Tr. 38).  Three
years later, in April 1997, after a period of unsuccessful

experimentation with various forms of medication, Lawrence was hospitalized at Hampstead Hospital for evaluation.  (Tr. 38-39). Dr. Kenneth Brown, Lawrence's physician at Hampstead Hospital, diagnosed Lawrence with disruptive disorder—NOS[1], ADHD and separation anxiety disorder.  (Tr. 272).  Almost six years later, in February of 2003, Lawrence was again admitted to Hampstead Hospital as a result of "increased outbursts and aggression."  (Tr. 274).  After this visit, Dr. Brown diagnosed Lawrence with bipolar disorder-NOS, pervasive development disorder-NOS[2] and ADHD.  (Tr. 282-84).

Between January, 2005 and March, 2006 Lawrence saw Dr. John Froelich at Community Partners Behavioral Health Services.  (Tr. 196-206).  In each appointment Dr. Froelich noted that Lawrence's mental status, mood and affect were normal.  (Tr. 196-206).  Lawrence and his mother consistently reported that he had been doing well, and that his irritability and mood symptoms

---

[1] NOS stands for "not otherwise specified."  In other words, conduct problems or oppositional behavior exist and cause a clinically significant impairment but do not meet criteria for a diagnosis.

[2] Pervasive developmental disorder is a "group of mental disorders of infancy, childhood, or adolescence characterized by distortions in the acquisition of the multiple basic psychological functions necessary for the elaboration of social skills, language skills, and imagination."  Stedman's Medical Dictionary 527 (27th ed. 2000).

3

had decreased since a prescription for Tripleptal[3] had been adjusted.  (Tr. 196-206).  In addition, Lawrence's ADHD symptoms had been controlled with Focalin[4].  (Tr. 198).  Lawrence was doing better in school and Dr. Froelich noted that Lawrence "has gotten more adept at social skills, and has many friends who come over and visit."  (Tr. 198).  Dr. Froelich diagnosed Lawrence as suffering from ADHD and oppositional defiant disorder[5] ("ODD").  (Tr. 198-202).  Dr. Froelich opined that Lawrence's bipolar disorder–NOS was in remission.  (Tr. 198-202).

On June 13, 2006, state agency medical consultant, Dr. Michael Schneider, completed a psychiatric review technique form.  (Tr. 251-64).  Dr. Schneider opined that Lawrence's ADHD and ODD would moderately restrict activities of daily living,

---

[3] Tripleptal (Oxcarbazepine) is used to control certain types of seizures by decreasing abnormal electrical activity in the brain.  See *Oxcarbazepine*, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000176/ (last visited June 17, 2011). Tripleptal is also used to treat bipolar disorder.  See id.

[4] Focalin (Dexmethylphenidate) is used to control symptoms of ADHD.  See *Dexmethylphenidate*, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000223/ (last visited June 17, 2011).

[5] Oppositional defiant disorder is "a disorder of childhood or adolescence characterized by a recurrent pattern of negativistic, hostile, and disobedient behavior toward authority figures."  Stedman's at 527.

social functioning, and concentration, persistence, or pace.
(Tr. 261).  Translating those findings into an assessment of
Lawrence's RFC, Dr. Schneider determined that Lawrence retained
the ability to understand, remember, and carry out short and
simple instructions; to maintain adequate attention for these
kinds of instructions and complete a normal workweek; to
interact appropriately with peers and supervisors only in an
environment where the supervisory criticism is not overly
critical; and to accommodate changes in the work setting.  (Tr.
267).

On July 20, 2006, Lawrence saw his primary care physician,
Dr. Benedict Heiderscheidt at Barrington Family Practice.  (Tr.
302).  Dr. Heiderscheidt noted that Lawrence appeared more
lively and animated, and reported that he had stopped taking his
medications because he had run out.  (Tr. 302)  Lawrence
indicated that he nevertheless felt more focused and was staying
on task.  (Tr. 302).  Accordingly, Lawrence expressed a desire
to remain off his medication.  (Tr. 303).

On December 15, 2006, Lawrence again saw Dr. Heiderscheidt.
He reported that he had stopped taking medications, but that he
wished to restart.  (Tr. 299).  He explained that since he had
stopped taking his medications his focus and memory had been
"way off."  (Tr. 299).  Lawrence requested that he be put back

on Focalin as he was taking classes and trying to obtain his high school diploma.  (Tr. 299).  Dr. Heiderscheidt placed Lawrence back on Focalin and prescribed Trazodone to help with Lawrence's difficulty sleeping.  (Tr. 299).

On August 15, 2007, at an appointment with Dr. Heiderscheidt, Lawrence reported that he was working at the Bow Lake Inn.  (Tr. 290).  Lawrence indicated that he had been doing better at work after restarting Focalin.  (Tr. 290).  While Lawrence did not notice a difference when taking medication, he claimed  that others around him reported that he was much more efficient.  (Tr. 290).  Two weeks later, Lawrence reported that his medication was working for the majority of the day, but was wearing off during the last forty minutes.  (Tr. 287).

On April 8, 2008, Lawrence underwent a comprehensive psychological consultative examination by Dr. Ernie Downs.  (Tr. 342-46).  Lawrence indicated that he had suffered from pervasive agitation since preschool and that he had frequently experienced racing thoughts, especially at night when he is trying to sleep. (Tr. 342).  He reported that for the past six weeks he had been working 20-30 hours a week at a supermarket.  (*Tr.* 345).  While working, Lawrence stated that he would become anxious and would need to sit down.  (Tr. 342).  Lawrence expressed an ability to focus on the task at hand, but explained that he frequently lost

6

sense of what needed to be done afterwards so transitions in activities were frequently difficult for him.  (Tr. 342-43).

On exam, Lawrence remained friendly, spontaneous, and on target.  (Tr. 344).  His speech was rapid and pressured, and it was difficult to understand words or phrases.  (Tr. 344). Lawrence was oriented to date, time, and place; and appeared to be of substantially above average intelligence.  (Tr. 344).  He reported that his memory is usually good, but he will forget obvious things when agitated.  (Tr. 344).  He also noted that his concentration is usually sufficient for reading, watching television, building computers, and creating web sites.  (Tr. 345).  Lawrence recounted how he and some friends were in the process of shooting a brief movie.  (Tr. 345).  Lawrence indicated that his oppositional behavior had ended years previously.  (Tr. 345).

Dr. Downs assessed Lawrence's current level of functioning, opining that Lawrence was able to understand and remember instructions, interact appropriately, communicate effectively, sustain attention, and complete tasks.  (Tr. 345).  Further, Dr. Downs noted that Lawrence could tolerate normal stress, make simple decisions, maintain work attendance, and interact appropriately with supervisors.  (Tr. 345).  Dr. Downs added, however, that Lawrence could not maintain a schedule.  (Tr.

345).

On April 22, 2008, Dr. Nicholas Kalfas, reviewed Lawrence's records, including Dr. Down's report, and completed a psychiatric review technique form. (Tr. 347). Therein, Dr. Kalfas opined that Lawrence's mental impairments were not "severe" because they caused no more than mild functional limitations. (Tr. 347-60).

On January 27, 2009, Lawrence was seen by Dr. Richard M. Naimark for an initial psychiatric evaluation. (Tr. 361-62). Lawrence reported good appetite, low motivation, low energy, fair concentration, good interests, daily panic, no suicidal thoughts, an occasional short fuse, occasional mania, and no compulsions. (Tr. 361). On exam, Lawrence appeared well-groomed; was cooperative; maintained good eye contact; displayed clear speech, a euthymic mood, appropriate affect, fair insight and judgment, and a goal directed thought process; he was oriented to time, place, and person; and appeared restless. (Tr. 362). He was diagnosed with ADHD and a mood disorder–NOS, and assigned a GAF score of 55.[6] (Tr. 362).

_____

[6] "GAF" stands for the "Global Assessment Functioning" scale. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 1994). The GAF score represents a clinician's assessment of his or her patient's overall level of functioning. Id. The score takes into account the patient's physiological, social and physical functioning.

On February 11, 2009, Dr. Naimark noted normal mental status examination findings apart from occasional anger, restlessness, and low energy.  (Tr. 382).  By March 24, 2009, Lawrence reported improved focus after taking a new medication, Vyvanse[7].  (Tr. 383).

On April 23, 2009, Dr. Naimark noted that Lawrence reported that his medications were quite helpful and that he was working at Walmart.  (Tr. 387).  Dr. Naimark also noted the following mental status findings: normal grooming, good eye contact, balanced mood, appropriate affect, goal directed thought process, no limitation to thought content, no suicidal thoughts, normal sleep, improving appetite, improved energy, improved concentration, no tearfulness, and no motor limitations.  (Tr. 387).

Dr. Naimark also assessed Lawrence's mental RFC.  (Tr. 384-86).  Therein, he opined that Lawrence suffered marked limitations in his abilities to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual with

Id.  A GAF score between 51-60 is consistent with moderate symptoms.  Id. at 34.

[7] Vyvanse (Lisdexamfetamine) is used to treat and control symptoms of ADHD.  See *Lisdexamfetamine*, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000397/ (last visited June 17, 2011).

customary tolerances; work in coordination with or proximity to others without being distracted by them; work with others, travel to unfamiliar places and use public transportation, set goals, and make plans independently of others.  (Tr. 384-85). Dr. Naimark described these limitations as "likely life-long." (Tr. 386).

**C.    Hearing Testimony**

At the November 13, 2009 hearing, Lawrence testified that he is primarily limited by anxiety, and his disability claim was based on a mental impairment and not a physical one.  (Tr. 28-30).

Lawrence testified that he had received his GED.  (Tr. 24). At that time, he was living with two roommates.  (Tr. 24).  He described a work history as a pizza maker, dishwasher, supermarket employee, a Target employee, a Walmart employee, working with electronics, a McDonald's employee, and as a Goodwill employee.  (Tr. 24-27).  From 2007-2009, Lawrence held eight jobs over the course of approximately two years.  (Tr. 25-28).

At the time of the hearing, Lawrence was working the night shift at K-Mart from 10:00 pm to 6:00 am.  (Tr. 33).  On a typical day he would wake up at 8:00 pm, check his email, shower, and then go to work stocking at K-Mart.  (Tr. 33).  When

he returned from work Lawrence noted that he would relax, play video games for an hour or two, then eat.  (Tr. 35).

Lawrence's mother also testified at the hearing.  She noted Lawrence has difficulty appearing at work and following through on most of his jobs.  (Tr. 43).  She reported that Lawrence's girlfriend is his coach.  (Tr. 43).  She would tell him when to shower, brush his teeth, and where his clothes are.  (Tr. 43). She noted that Lawrence needs constant reminders always needs a great deal of support in order to get through the day.  (Tr. 43-44).  She remarked that while Lawrence has a hard time staying on task, he enjoys going to work.  (Tr. 44).

**D.   <u>The ALJ's Decision</u>**

In his November 24, 2009 decision, the ALJ followed the five-step sequential evaluation process established by the Social Security Administration, as set forth under 20 C.F.R. § 404.1520(a)(4)(i)-(v), to determine whether an individual is disabled.  (Tr. 4-19).  Under the first step, the ALJ found that Lawrence had not engaged in any substantial gainful activity since July 7, 2006, the amended alleged onset date.  (Tr. 10). Under step two he found that Lawrence's ADD was a severe impairment.  (Tr. 10).  The ALJ also considered Lawrence's diagnoses of mood disorder and bipolar disorder, but determined that they were not severe.  (Tr. 10).  At step three, the ALJ

11

found that Lawrence did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 10-12).  The ALJ went on to find that Lawrence retained the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: "[Lawrence] can perform simple two to three step tasks, and can tolerate frequent contact with supervisors and occasional contact with co-workers and the public.  [Lawrence] can maintain the concentration necessary for two to three-step tasks. [Lawrence] is able to accommodate normal changes in the work setting." (Tr. 12).  At step four, the ALJ concluded that Lawrence had no past relevant work.  (Tr. 14).  Finally, at step five, the ALJ noted that there were jobs existing in significant numbers in the national economy that Lawrence was able to perform.  (Tr. 15).  As a result, the ALJ concluded that the Lawrence was not under a "disability" as defined by the Social Security Act, at any time since July 7, 2006, Lawrence's amended alleged onset date, through the date of the decision.  (Tr. 15).

## II.  <u>STANDARD OF REVIEW</u>

An individual seeking social security benefits has a right to judicial review of a decision denying his application.

See 42 U.S.C. § 405(g).  I am empowered to affirm, modify,
reverse or remand the decision of the Commissioner based upon
the pleadings submitted by the parties and the transcript of the
administrative record.  See id.  However, my review is limited
to determining whether the ALJ used the proper legal standards
and found facts based on the proper quantum of evidence.  See
Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The factual findings of the Commissioner are conclusive if
they are supported by "substantial evidence."  See id.
Substantial evidence is evidence which a "reasonable mind,
reviewing the evidence in the record as a whole, could accept
. . . as adequate to support [the] conclusion."  Rodriguez v.
Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.
1981).  If the substantial evidence standard is met, the ALJ's
factual findings are conclusive even if the record could support
a different conclusion.  See Irlanda Ortiz v. Sec'y of Health &
Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).

In addition, it is "the responsibility of the [ALJ] to
determine issues of credibility and to draw inferences from the
record evidence."  Id. at 769.  It is the role of the ALJ, and
not the role of this court, to resolve conflicts in the
evidence.  Id.

13

### III.  <u>ANALYSIS</u>

Lawrence lodges various complaints against the ALJ's decision.  First, Lawrence contends that the ALJ erred at step two by discounting Lawrence's pervasive developmental disorder as a severe impairment.  Next, Lawrence argues that the ALJ's RFC determination at step three was deficient because it: (i) failed to properly credit the opinion of Dr. Naimark, (ii) did not adequately consider his mother's testimony and (iii) failed to consider evidence of a disability decision by another governmental agency.  Finally, Lawrence faults the ALJ's sole reliance on the Grid at step five.  I will address each argument in turn.

### A.  <u>Lawrence's Developmental Disorder</u>

In the second step of his five-step evaluation, the ALJ determined that Lawrence's ADD constituted a severe impairment. (Tr. 10).  While the ALJ recognized that Lawrence had been diagnosed with bipolar and other mood disorders, he did not consider these conditions "severe."  Lawrence claims that the ALJ's erred by not qualifying his pervasive developmental disorder as a severe.

At step two of the five-step sequential evaluation process, a claimant must demonstrate that he suffers from a medically

severe impairment.  See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); 20 C.F.R §§ 404.1512(c); 404.1520(a)(4)(ii).  In order for an impairment to be considered "severe" it must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c). Basic work activities include such tasks as "understanding, carrying out, and remembering simple instructions" or "responding appropriately to supervision, co-workers and usual work situations."  See 20 C.F.R. § 404.1521(b).

While Lawrence was diagnosed with pervasive developmental disorder-NOS in February of 2003 and June of 2004, substantial evidence supports the ALJ's decision that this ailment did not significantly limit his ability to perform basic work activities following his alleged onset date of July 7, 2006.  First, Lawrence fails to provide any evidence that he continued to suffer from pervasive developmental disorder following his alleged onset date.  See Bowen, 482 U.S. at 146 n. 5 (noting that it is the claimant's burden to prove that he or she suffers from a severe medical impairment).  Instead, the evidence in the record indicates that the condition no longer plagued Lawrence. In his August 15, 2007 treatment notes, Lawrence's primary care physician lists Lawrence's pervasive development disorder as "historic" and does not report it as an "existing problem."

15

(Tr. 290).  In his April 16, 2008 evaluation of Lawrence, Dr. Ernie Downs reported that while Lawrence had been diagnosed with pervasive developmental disorder, Lawrence was able to "tolerate the stresses common to a work environment" and was able to "make simple decisions . . . maintain attendance . . . [and] interact appropriately with supervisors."  See 20 C.F.R. § 404.1521(b); (Tr. 345).  In addition, Dr. Downs noted that Lawrence "display[ed] universally good social skills and social comprehension."  (Tr. 345-46).  Finally, in an April 2009 progress note Dr. Naimark indicated that the diagnosis of a mood disorder was "unlikely" noting that Lawrence's mood was "balanced" and his thought process "goal directed."  (Tr. 387).  As a result, the ALJ's decision that Lawrence's pervasive developmental disorder was not severe is supported by substantial evidence.

**B.   <u>The ALJ's RFC Determination</u>**

In step three of the five-step sequential evaluation, the ALJ determined that Lawrence had the

> residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple two to three-step tasks, and can tolerate frequent contact with supervisors and occasional contact with coworkers and the public.  The claimant can maintain the concentration necessary for two to three-step tasks.  The claimant is able to accommodate normal changes in the work setting.

(Tr. 12).

Lawrence claims that the ALJ's RFC determination was faulty because it failed to: (1) properly credit the opinion of Dr. Naimark; (2) consider the testimony of Lawrence's mother; and (3) reflect the disability decision of the New Hampshire Department of Health and Human Services.

### 1.   Treating Source Opinion

Lawrence contends that the ALJ erred by not according sufficient weight to the opinion of Dr. Naimark, who examined Lawrence four times over the course of four months in 2009. After these evaluations, Dr. Naimark filled out a Medical Source Statement ("MSS") in which he noted that Lawrence suffered marked restrictions in his ability to: understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual with customary tolerances, work in coordination with or proximity to others without being distracted by them, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  (Tr. 384-86).  Along with noting Dr. Naimark's status as his treating physician, Lawrence argues that the ALJ erred in failing to fairly credit his doctor's opinion

17

because it is consistent with his past history of psychological treatment, his testimony, and the testimony of his mother.

In making a disability determination, an ALJ must consider medical opinions in the case record. See 20 C.F.R. § 404.1527(b). The weight given to any given medical opinion is based on such factors as the nature and length of the examining relationship. See 20 C.F.R. § 404.1527(d)(1)-(2). As a result, an ALJ will generally give greater weight to treating physicians, as these sources provide a more detailed and longitudinal picture of the claimant's medical condition than individual or consultive examinations. See id. Nevertheless, the weight to be given to a treating source's opinion is still contingent upon the evidence provided to support the opinion, the degree to which it is consistent with the record, the extent of the treating source's knowledge of the impairment, and other factors that are raised by the claimant. See SSR 96-2p, 1996 WL 374188, at *2-*5 (July 2, 1996).

While certain aspects of Lawrence's prior history and testimony lend support to Dr. Naimark's opinion, the record also contains substantial evidence supporting the ALJ's decision to afford his opinion less weight. First, Dr. Naimark's opinions are themselves inconsistent. While Dr. Naimark indicated that Lawrence suffered from marked restrictions in his ability to

concentrate and work with others, he also assigned Lawrence a GAF score at fifty-five (55).  (Tr. 362).  A GAF score between fifty-one (51) and sixty (60) is consistent with only "moderate difficulty in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 31 (4th ed. 1994).  In addition, in several of his evaluations, Dr. Naimark described Lawrence as displaying "fair insight and judgment" and a "goal directed" thought process.  (Tr. 362, 382-83, 387).  Moreover, Dr. Naimark noted that Lawrence had "fair" concentration which improved with his ADHD medication Vyvanse, while Lawrence reported that his "focus was a lot better."  (Tr. 383).

Dr. Naimark's opinion is also inconsistent with other medical opinions contained in the record.  From January, 2005 to March, 2006, Lawrence was seen eight (8) times by Dr. Froelich at Community Partners Behavioral Health.  (Tr. 198-205).  During these evaluations, Lawrence and his mother consistently reported that he had been doing well, and that his irritability and mood symptoms had decreased.  (Tr. 198-205).  Lawrence reported that he was doing better in school and Dr. Froelich noted that Lawrence "has gotten more adept at social skills, and has many friends who come over and visit."  (Tr. 198).  After each visit Dr. Froelich opined that Lawrence's mental status, mood and

affect were normal.  (Tr. 198-205).  Dr. Froelich did not
indicate that Lawrence suffered from pervasive developmental
disorder, and he noted that Lawrence's bipolar disorder-NOS was
in remission.  (Tr. 198).

On April 16, 2008, Lawrence was seen by Dr. Ernie Downs for
a comprehensive psychological profile.  (Tr. 342-46).  In his
evaluation, Dr. Downs noted that Lawrence was able to "interact
appropriately and communicate effectively . . . sustain
attention and complete tasks . . . make simple decisions . . .
maintain attendance . . . [and] interact appropriately with
supervisors."  (Tr. 345).  While Dr. Downs recognized that
Lawrence had previously been diagnosed with pervasive
developmental disorder, he declined to make his own diagnosis.
(Tr. 345).  Instead Dr. Downs remarked that Lawrence displayed
"universally good social skills and social comprehension."  (Tr.
345-46).

Finally, Dr. Naimark's opinion is inconsistent with
Lawrence's own testimony.  At his disability hearing Lawrence
described his typical day.  (Tr. 33-36).  He noted that he would
wake up, check his email and shower before work, where he
stocked shelves at Target from 10 p.m. to 6 a.m.  (Tr. 33).
Lawrence remarked that his assignments were "pretty strait
forward," and he gave no indication that he struggled with the

20

work or had trouble following directions.  (Tr. 34).  Following

work, Lawrence testified that he would go home and relax, play

videogames for an hour or two, and eat breakfast.  (Tr. 35).

Lawrence also described how he enjoyed building computers and

writing computer programs.  (Tr. 122, 126).  Based on this

testimony, as well as the opinions of both Dr. Naimark and other

physicians, Lawrence's restrictions do not appear as marked as

those described by Dr. Naimark.  As a result, substantial

evidence supported the ALJ's decision to lend less credence to

his opinion.  See 20 C.F.R. § 404.1527(d)(3)(explaining opinions

weight is contingent, in part, on its consistency and

supportability).

    2.  Non-Medical Opinion

Lawrence next contends that the ALJ erred by not adequately

considering the opinion of Lawrence's mother as well as the

disability determination by the State of New Hampshire.

When making a disability determination, the Commissioner

relies on "all available evidence in the [claimant's] case

record."  SSR 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006).

This includes statements by the claimant and "others about the

impairment(s) and how it affects the individual's functioning .

. . and decisions by other governmental and nongovernmental

agencies about whether an individual is disabled."  Id.

21

### a. Testimony of Mrs. Lawrence

At the hearing before the ALJ, Lawrence's mother testified about the extent of Lawrence's disability. (Tr. 37-45). She described Lawrence's childhood and his history of hospitalization. (Tr. 38-39). In addition, she noted how Lawrence had difficulty appearing at work and following through on most of his jobs. (Tr. 43). Ms. Lawrence also reported how Lawrence relied on his girlfriend as his "coach" for help with daily activities. (Tr. 43).

While Lawrence contends that the ALJ failed to consider much of Mrs. Lawrence's opinion, the ALJ's decision explicitly recounts her testimony. (See Tr. 12-13). The ALJ described Lawrence's hospitalization, his trouble in school, his difficulty keeping a job, and the support of his girlfriend. (See Tr. 12-13). While the ALJ considered this testimony, he discounted its pertinence because of its inconsistency with the record. (See Tr. 13). Substantial evidence supports this decision.

First, as detailed above, the evaluations conducted by Drs. Froelich, Schneider, Downs and Kalfas all indicate less severe restrictions on Lawrence's fundamental capacity than those described by Mrs. Lawrence. (See Tr. 198-206, 267, 345, 347-60). In his meetings with Dr. Froelich, Lawrence and his mother

reported that Lawrence had been doing "fantastically" and that
he had been doing "well at school and at home and [that] there
have not been any behavioral issues or problems with ADHD
symptoms."  (Tr. 198-99, 205).  In addition, Lawrence and his
mother noted that he had gotten "more adept at social skills."
(Tr. 199).  Objectively, Dr. Froelich noted that his mental
status, mood and affect were all normal.  (Tr. 196-206).  In the
psychiatric review form completed by Dr. Schneider on June 13,
2008, Dr. Schneider opined that Lawrence's ADD and ODD would
only cause him moderate restrictions on activities of daily
living, maintaining social functioning and maintaining
concentration.  (Tr. 261).  Similarly Dr. Kalfas, after
reviewing Lawrence's records, indicated that Lawrence's mental
impairments would cause no more than mild functional
limitations.  (Tr. 347-59).  Finally, after his evaluation of
Lawrence, Dr. Downs remarked that Lawrence was able to
understand and remember instructions, interact appropriately,
sustain attention, complete tasks as well as tolerate normal
stress, and make simple decisions.  (Tr. 345).

Mrs. Lawrence's testimony was also inconsistent with that
of her son.  While noting that the hours were only temporary,
Lawrence testified that he was currently working an eight-hour
shift at K-Mart where the work was "pretty strait forward."

(Tr. 34).  Further, although Lawrence relied on his mother and girlfriend for assistance, he indicated that he was able to successfully perform many activities of daily living such as cooking simple meals, cleaning his apartment, tending to his personal care needs, and helping to care for a pet.  (Tr. 122-26).  Lawrence also described his ability to perform complex tasks such as building computers and writing computer programs. (Tr. 122, 126).  Finally, Lawrence's lucidity at the hearing detracted from the marked limitations described by his mother. At the hearing Lawrence was "able to explain, in great detail, the history behind one of his favorite online computer games" which he was able to play one to two hours at a time.  (Tr. 35-37).

It is the "responsibility of the [ALJ] to determine issues of credibility" and to resolve conflicts in the evidence. Irlanda Ortiz, 955 F.2d at 769.  Based on the medical opinions of Lawrence's treating and non-treating physicians, as well as Lawrence's own testimony, substantial evidence supports the ALJ's determination that Lawrence's symptoms were not as severe as those described by his mother.  See id.

### b. New Hampshire's Disability Determination

On July 23, 2009 Lawrence was awarded benefits by the New Hampshire Department of Health and Human Services pursuant to

N.H. Rev. Stat. Ann. § 167:6(VI).  Lawrence claims that the ALJ
erred when he failed to consider this disability determination.

A determination by another governmental agency "may provide
insight into the [claimant's] mental and physical impairment,"
especially where the agency's decision discusses relevant
evidence and the basis for their disability determination.  SSR
06-03p at *1.  As a result, the ALJ generally "should explain
the consideration given to these decisions."  See Dube v.
Astrue, 1:10-cv-179-JL, 2011 WL 742520, at *7 n. 16 (D.N.H.
2011)(noting permissive nature of requirement).  Nevertheless,
the ALJ "is not bound by disability decision by other
governmental and non-governmental agencies" and their relevance
may be limited because "other agencies may apply different rules
and standards . . . for determining whether an individual is
disabled."  SSR 06-03p at *7.

It was not error for the ALJ to disregard the disability
determination by the State of New Hampshire.  The decision
referenced by Lawrence is a single-page document indicating that
he was receiving benefits from the New Hampshire Department of
Health and Human Services.  (Tr. 107).  It does not contain any
evidence or relevant analysis detailing the agency's rationale
for their award.  See SSR 06-03p at *6-7.  As a result, the ALJ
was justified in omitting this decision from his own disability

25

determination.  See Dube, 2011 WL 742520 at *7 n. 16.

C.    **Reliance on the Grid**

     Finally, Lawrence contends that it was error for the ALJ to
utilize the Grid at step five to find that Lawrence could
perform a significant number of jobs in the national economy in
spite of his impairments.

     The Grid is designed to streamline the Commissioner's
burden of proving the existence of other jobs in the economy
that the claimant can perform without requiring the use of a
vocational expert.  Ortiz v. Sec'y of Health & Human Servs., 890
F.2d 520, 524 (1st Cir. 1989).  If a nonexterional impairment is
significant, the Commissioner generally may not rely solely on
the Grid.  See id. (quotations and citations omitted).  However,
"[i]f a non-strength impairment, even though considered
significant, has the effect of only reducing [an] occupational
base marginally, the Grid remains highly relevant and can be
relied on exclusively."  Id.

     As previously noted, the ALJ determined that Lawrence's ADD
constituted a severe mental impairment.  As a result, the ALJ
necessarily determined that Lawrence's ADD significantly limited
his ability to perform basic work activities.  See 20 C.F.R. §
404.1520(c).  While such a determination ordinarily would
forestall the ALJ's reliance on the Grid, the ALJ was not

required to obtain additional support for his step five determination as Lawrence's ability to perform unskilled work was only marginally reduced by his mental impairment.  See Ortiz, 890 F.2d at 524 ("so long as a nonexertional impairment is justifiably found to be substantially consistent with the performance of the full range of unskilled work, the Grid retains its relevance and the need for vocational testimony is obviated"); SSR 85-15, 1985 WL 56857, *4 (1985); (Tr. 15).

In his RFC determination, the ALJ found that Lawrence retained the ability to perform the basic mental demands of unskilled work, noting that he could "understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting."  See SSR 85-15 at *4; (Tr. 15).  As previously noted, this RFC was supported by substantial evidence.  See supra Part III.B; (Tr. 35-37, 126, 267, 345).  While Lawrence cites Dr. Schneider's opinion noting that Lawrence suffered various moderate limitations which would detract from the potential occupational bases, these limitations would not significantly reduce Lawrence's ability to perform the full range of unskilled jobs.  See Ortiz, 890 F.3d at 527; (Tr. 15, 35-37, 126, 267, 345).  As a result, the ALJ's reliance on the Grid, while not preferable, was supportable.  See Ortiz, 890

F.2d at 524.

## IV.  **CONCLUSION**

The ALJ's decision is supported by substantial evidence. Therefore, the court is without the authority to overturn it. The motion for order affirming the decision of the Commissioner (Doc. No. 11) is granted, and the plaintiff's motion for order reversing the decision of the Commissioner (Doc. No 9) is denied.  Accordingly, the clerk shall enter judgment and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

June 17, 2011

cc:  Michael Seaton, Esq.
     T. David Plourde, Esq.